IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CLAY CALDWELL,                          )
                                        )
                Plaintiff               )
                                        )
        vs.                             )       Civil Action No. 09-217
                                        )       Judge Terrence F. McVerry/
LOUIS FOLINO, Superintendent; JEAN      )       Magistrate Judge Amy Reynolds Hay
W. SCOTT, Business Manager; DAN         )
DAVIS, Superintendents Assistance &     )
Grievance Coordinator; DEAN             )
GEEHRING, Mailroom Supervisor,          )
                                        )
                Defendants              )


REPORT AND RECOMMENDATION

I.      Recommendation

        It is respectfully recommended that the civil rights complaint be dismissed before it is

served for failure to state a claim upon which relief can be granted, pursuant to the screening

provisions of the Prison Litigation Reform Act.

II.     Report

        Clay Caldwell ("Plaintiff"), currently incarcerated at SCI-Greensburg, is serving a life

sentence for murder.[1]  Having much time on his hands, it appears that Plaintiff has, of late,

decided to spend it by engaging in litigation.  Excluding two habeas petitions, Plaintiff has, since

May 29, 2007, filed seven civil rights actions in this court, and three appeals in the Court of

_____

        [1]   The Court takes note of the dockets of the Court of Common Pleas of Philadelphia County in
the criminal case of Commonwealth v. Clay Caldwell, No. CP-51-CR-1107861-1999, which reveal that
Plaintiff pleaded guilty to first degree murder as of 12/19/2000 and was sentenced to life.  Those dockets
further reveal that no direct appeal was filed and that a PCRA petition was not filed until February 9,
2006, more than five years after his conviction became final.

Appeals for the Third Circuit.[2]   The current suit, filed on February 20, 2009, is not even his most recent case.  The most recent case was just filed on April 23, 2009.

The current suit is filed against four DOC employees.  Plaintiff named the following as defendants:  Louis Folino, Superintendent at SCI-Greene, the prison in which Plaintiff was housed until very recently,[3] Jean Scott, the Business Manager there, Dan Davis, the Superintendent's Assistant and Grievance Coordinator and finally, Dan Geehring, the Mailroom Supervisor.

Plaintiff complains that these Defendants all somehow interfered with his legal mail by, *inter alia*, opening what he contends to be his incoming "legal" mail outside of his presence and by not mailing out a piece of his legal mail to a court, thereby causing him to lose his case.  Because the documents which he himself attached to his complaint establish that the incoming mail was not "legal" mail, his complaint fails to state a claim.  Alternatively, even if the contents of the incoming envelopes were "legal" mail, because the envelopes did not comply with DOC policy for alerting DOC officials that the envelopes contained legal mail, his complaint fails to state a claim.  As to the outgoing legal mail, because the alleged interference with the mail occurred more than two years prior to the filing of the complaint, such claim is time barred.  In the alternative, because the suit which the alleged interference caused him to lose was an untimely filed PCRA petition, his complaint fails to state a claim for the denial of access to courts given that the lost case was not "non-frivolous."

A.   Relevant Procedural History

---

[2]  A search for litigant name "Caldwell, Clay" on PACER, reveals Plaintiff's recent penchant for litigating.

[3]  See Caldwell v. Folino, No. 08-122 (W.D. Pa. Dkt. [63] filed April 30, 2009) (change of address).

On February 18, 2009, Plaintiff executed both a civil rights complaint and an application to proceed IFP. Plaintiff's motion to proceed IFP was granted. That civil rights complaint had attached to it many exhibits that Plaintiff wished the court to consider.

Plaintiff complained of his "legal" mail, both outgoing and incoming. Specifically, as to the incoming "legal" mail, Plaintiff complains of two discrete incidents. First, Plaintiff complained that on May 14, 2008, "legal" mail was opened outside of his presence. The particular piece of "legal" mail that was opened outside of his presence on May 14, 2008 was from the Pennsylvania Bar Association Lawyer Referral Service. Dkt. [1-2] at 2. The second incident occurred on December 16, 2008, when Plaintiff alleges that his "legal" mail was again opened outside of his presence, this time, involving a letter sent to him from Kathryn Kenyon, of the law firm of Pietragallo, Gordon, Alfano, Bosick & Raspanti, LLP, who was representing defendants in another civil rights suit that Plaintiff had filed against DOC officials. It appears that such letter was simply a notice of appearance being filed by Attorney Kenyon. Dkt. [1-3] at 16 (notice of appearance filed on 12/15/08 in Plaintiff's other case). See also Dkt. [1-2] at 8 (complaining that the following was opened outside of his presence: "Legal mail is from counsel for the defendants in Civil Action No. 08-0728 now pending"); Dkt. [1-3] at 10. See also Caldwell v. Fogel, No. 08-cv-278 (W.D. Pa. Dkt. [28])(a filing by Plaintiff wherein he states that he had not "received any type of notice that the U.S.Marshal [sic] had served the Defendants until today 12/16/08, when he received a notice that the defendants in the above case matter has counsel now and this Legal mail was opened outside of the presence of the addressee the plaintiff who has filed another grievance about this matter again. . . .").

In yet a third incident, of unspecified date, Plaintiff complains that both his incoming and outgoing legal mail was interfered with. He complains that he was ordered by the Court of

Common Pleas to file a statement of matters complained of on appeal in his PCRA proceedings in <u>Commonwealth v. Caldwell</u>, No. CP-51-Cr-1107861-1999. Dkt. [1-3] at 2. This order was issued November 20, 2006 and apparently sent out to him on November 21, 2006 but he did not receive it until November 28, 2006, Dkt. [1-3] at 3, and he further complains that he had only until December 8, 2006 by which to comply with the order to file his statement of matters complained of on appeal. <u>Id</u>. Plaintiff further alleges that he did in fact send out such a statement of matters complained of on appeal via certified mail. Dkt. [1-3] at 4. However, he claims that somehow, this mail was interfered with and it never arrived at the Court. As a consequence, Plaintiff complains that all of his issues were then waived upon appeal. Dkt. [1] at 4. In fact though, as will be seen below, the case was Plaintiff's second PCRA petition and was barred as being untimely filed by the Superior Court, rather than being denied as having waived any issues for failure to file a statement of matters complained of on appeal. It was only in the PCRA trial Court's opinion that the PCRA trial Court asserted that Plaintiff should be deemed to have waived any issues on appeal for having failed to file the required statement.

Plaintiff alleges that the foregoing facts state a claim for violations of his First, Fifth and Fourteenth (both equal protection and due process) Amendment rights.

B. <u>Applicable Legal Principles</u>

In the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), Congress adopted major changes affecting civil rights actions brought by prisoners in an effort to curb the increasing number of frivolous and harassing law suits brought by persons in custody. <u>Santana v. United States</u>, 98 F.3d 752, 755 (3d Cir. 1996). Because Plaintiff is a "prisoner" who has filed a civil action against "officer[s] or employee[s] of a governmental entity" within the meaning of 28 U.S.C. § 1915A(a), the screening provision of Section

1915A(b) apply herein. Similarly, because Plaintiff is a "prisoner" challenging "prison

conditions",[4] the screening provision of 42 U.S.C. § 1997e(c)(1) applies. Similarly, because

Plaintiff is a "prisoner" who has been granted IFP status, the screening provisions of 28 U.S.C.

1915(e) apply. These screening provisions permit a court to dismiss such complaints if the court

determines them to be frivolous, malicious, or if they fail to state a claim upon which relief may

be granted.

        In performing a court's mandated function of sua sponte reviewing a complaint under

28 U.S.C. §§ 1915A, and 1915(e) and 42 U.S.C. § 1997e to determine if it fails to state a claim

upon which relief can be granted, a federal district court applies the same standard applied to

motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). Tucker v. Angelone, 954 F.

Supp. 134, 135 (E.D. Va. 1977) ("Under 28 U.S.C. §§ 1915A, 1915(e) and 42 U.S.C. § 1997e(c)

the courts are directed to dismiss any claims made by inmates that 'fail to state a claim upon

which relief could be granted'. This is the familiar standard for a motion to dismiss under

Fed.R.Civ.P. 12(b)(6)."), aff'd, 116 F.3d 473 (4th Cir. 1997) (Table).

        In reviewing complaints as mandated by the screening provisions of the PLRA, the Court

applies, as noted, the standards applicable to a 12(b)(6) motion to dismiss. The Supreme Court

recently held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), a complaint must be

dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be

granted if it does not plead "enough facts to state a claim to relief that is plausible on its face."

Id. at 570 (rejecting the traditional 12(b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41,

---

        [4]   Porter v. Nussle, 534 U.S. 516, 532 (2002)("the PLRA's exhaustion requirement [for 'prison
conditions'] applies to all inmate suits about prison life, whether they involve general circumstances or
particular episodes, and whether they allege excessive force or some other wrong."); Booth v. Churner,
206 F.3d 289, 295 (3d Cir. 2000), aff'd, 532 U.S. 731 (2001) (explaining the statutory phrase "prison
conditions" to include claims concerning "actions . . . [that] make their [i.e. prisoners] lives worse.").

5

45-46 (1957)).  The <u>Bell Atlantic</u> standard is couched in terms of "plausibility."  <u>See</u> <u>e.g.</u>, <u>id</u>. at 564 ("When we look for plausibility in this complaint, we agree with the District Court that plaintiffs' claim of conspiracy in restraint of trade comes up short.").  However, because Plaintiff is pro se, courts accord an even more liberal reading of the complaint, employing less stringent standards when considering pro se pleadings than when judging the work product of an attorney. <u>Haines v. Kerner</u>, 404 U.S. 519 (1972).  Nevertheless, the plausibility standard of <u>Bell Atlantic</u> applies even to pro se litigants.  <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, __,  127 S.Ct. 2197, 2200 (2007)(applying <u>Bell Atlantic</u> in pro se case).

In reviewing complaints as mandated by 42 U.S.C. § 1997e and 28 U.S.C. §§ 1915A & 1915(e) and, consequently, utilizing the standards for a 12(b)(6) motion to dismiss, the complaint must be read in the light most favorable to the Plaintiff and all well-pleaded, material allegations of fact in the complaint must be taken as true.  <u>See</u>  <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976). However, the court need not accept as true any legal averments or legal conclusions contained in the complaint.  <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation."); <u>Labovitz v. Washington Times Corp.</u>, 172 F.3d 897, 898 (D.C. Cir. 1999)(the court "need not accept purely legal conclusions masquerading as factual allegations.")(some internal quotations omitted). Neither does the court have to accept as true anything in the complaint which contradicts facts of which the court may take judicial notice.  <u>See</u>, <u>e.g.</u>, <u>Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th Cir. 2001)(In ruling on a motion to dismiss, "[t]he court need not, however, accept as true allegations that contradict matters properly subject to judicial notice. . . ."), *opinion amended on denial of rehearing by*, 275 F.3d 1187 (9th Cir. 2001);  <u>Common wealth Edison Co.</u>

v. United States, 46 Fed. Cl. 158, 160 n.3 (Fed. Cl. 2000)("Contrary to plaintiff's claim, it is well-established that a court need not accept as true allegations contained in a complaint that are contradicted by matters on which the court may take judicial notice. . . ."), aff'd, 271 F.3d 1327 (Fed.Cir. 2001).

In addition to the complaint, courts may consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case in disposing of a motion to dismiss under Rule 12(b)(6). Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 n.2 (3d Cir. 1994); Chester County Intermediate Unit v. Pennsylvania Blue Shield, 896 F.2d 808, 812 (3d Cir. 1990). Because the court may consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case in disposing of a motion to dismiss under Rule 12(b)(6), and because the standards for dismissal for failing to state a claim under 28 U.S.C. §§ 1915A & 1915(e) and under 42 U.S.C. § 1997e are the same as under a 12(b)(6) motion, the court may consider these same matters in performing its screening function under 28 U.S.C. §§ 1915A & 1915(e) and 42 U.S.C. §1997e. See Lloyd v. United States, No. 99 C 3347, 1999 WL 759375, at *1 (N.D. Ill. Sept. 3, 1999) ("As the court may take judicial notice of public records without converting a motion to dismiss to a motion for summary judgment, *Henson v. CSC Credit Services*, 29 F.3d 280, 284 (7th Cir. 1994), the court will take judicial notice of court records in conducting its initial review under §1915A.").

C. Discussion

We first take up Plaintiff's complaint that the Defendants violated his First Amendment right by opening his incoming "legal" mail on two discrete occasions outside of his presence.

This case presents two important questions. What is the definition of "legal mail" and who gets to decide what is the definition of legal mail, or more accurately, who gets to decide

how the DOC shall be alerted to the fact that incoming envelopes contain "legal" mail so as to qualify for the protection of being opened only in the presence of the inmate?

In a very recent decision by the Court of Appeals, filed on March 10, 2009, addressing the DOC policy that governs the opening of incoming "legal" or privileged mail, the Court explained the following:

> To ensure that inmates cannot obtain contraband through the mail system, the DOC has policies for opening and inspecting incoming prison mail. The DOC receives mail addressed to inmates in mailrooms, which are located outside the perimeter of each corrections facility. There, the mail is x-rayed and sorted. Mail inspectors at these off-site facilities then open and inspect regular mail for contraband. Legal mail,[1] however, must be treated differently. Although the DOC prohibits mail inspectors from reading mail addressed to inmates except in special circumstances, constitutional obligations require the DOC to take additional measures to ensure that legal mail remains unread. *See Jones v. Brown*, 461 F.3d 353, 355 (3d Cir. 2006) (holding that "state prisoners have an interest protected by the First Amendment in being present when their incoming legal mail is opened."); *see also Bieregu v. Reno*, 59 F.3d 1445, 1452 (3d Cir. 1995) ("[A] pattern and practice of opening properly marked incoming *court* mail outside an inmate's presence infringes communication protected by the right to free speech." (emphasis added)). A policy that allows the opening of legal mail without the physical presence of addressee inmates "deprives the expression of confidentiality and chills the inmates' protected expression, regardless of the state's good-faith protestations that it does not, and will not, read the content of the communications." *Jones*, 461 F.3d at 359. As a result, the DOC tries to separate legal mail from regular mail so that legal mail can be opened and inspected for the first time in the addressee inmate's presence. How the DOC distinguishes between legal and regular mail is at the heart of this dispute.

_____

[1.] For the purposes of this opinion, we use the term "legal mail" to refer to incoming attorney and court mail, collectively.

> Under the DOC mail policy in place from the 1970s until 2002, DOC staff looked at the return address alone to determine whether the sender was an attorney or court. If the return address indicated that the mail originated from one of those sources, the mail was classified as a "Privileged Correspondence."[2] Privileged Correspondence was then separated from the regular mail, sent to the corrections facility, and opened and inspected for the first time by on-site Housing Unit Officers in the inmates' presence.

_____

The designation "Privileged Correspondence" does not necessarily equate with legal privilege. The DOC's mail policies define Privileged Correspondence as correspondence that meets specified conditions, and it has been limited to communications from attorneys, courts, and certain elected and appointed officials.

In 2002, the DOC decided to change its policies and procedures for handling and inspecting legal mail sent to inmates. Appellant Jeffrey Beard, the Secretary of the DOC, explained during a deposition that the DOC had "ongoing concerns about the privileged mail that was coming to our institutions, because on a not infrequent basis, and in virtually all of our institutions at one time or another, we have come across attempts by inmates to smuggle various items in what was considered to be privileged mail." Two reports prepared in 1999 evidenced those ongoing concerns. A November 1999 report analyzing the high-profile escape of an inmate (the "Escape Report") suggested that the hacksaw blade and security screwdriver the inmate used to escape were obtained through mail treated as Privileged Correspondence. Additionally, a September 1999 report entitled "Privileged Correspondence Inspection and Contraband" (the "September Report") contained a "random sampling of incidents involving legal mail abuse." The September Report advised the DOC to revise the existing mail inspection policies because 1) contraband contained in Privileged Correspondence would pass through corrections facility gates before it could be discovered; and 2) the inspection of Privileged Correspondence was less effective because Housing Unit Officers had less experience and time to devote to the task than the professional Corrections Mail Inspectors.

After negotiating proposed revisions with the American Civil Liberties Union, Pennsylvania Institutional Law Project, and the Defender Association of Philadelphia, the DOC issued a new mail policy on September 1, 2002, effective September 30, 2002. Under the new policy, incoming attorney communications could be treated as Privileged Correspondence only if they met one of two conditions: 1) the attorneys hand-delivered the sealed communications to specified DOC facilities; or 2) the attorneys obtained a Control Number from the DOC and placed the Control Number on each envelope mailed to an inmate. Attorneys could obtain a Control Number by faxing a letter request containing the attorney's name, address, telephone and fax numbers, state attorney identification number, and a written verification subject to the penalties of 18 Pa. Cons.Stat. § 4904[3] that all mail sent to inmates using the Control Number would contain "only essential confidential, attorney-client communication and [would] contain no contraband." The DOC must then provide the attorney with a Control Number one business day after receiving a request.[4] A subsequent revision that was issued on May 20, 2004, effective July 15, 2004, made two relevant changes: the revision 1) allowed courts to obtain Control Numbers in the same manner as attorneys;[5] and 2) required all incoming mail that did not bear a Control Number but still

appeared to be from a court to be hand-delivered after it was opened and inspected like other regular mail.

_____
[3.] 18 Pa. Cons.Stat. § 4904 describes certain misdemeanors associated with making unsworn false statements to authorities.

_____
[4.] The American Civil Liberties Union Foundation of Pennsylvania approved of the DOC's plan to require Control Numbers on attorney mail in a letter dated June 25, 2002.

_____
[5.] A court seeking a Control Number faxes a letter request on official letterhead, signed by any judge or chief non-judicial officer of the court.

Id., at 174 - 76.   The prisoners in Fontroy challenged the newer regulation, requiring a control number on the envelope as violative of their First Amendment rights because it permitted the DOC to open what might otherwise constitute "legal" mail outside the inmates' presence if such mail did not have a control number.   The Court of Appeals performed a Turner analysis and found the policy constitutional.

We find that the Fontroy case answers both of the questions that this case presents. The clear implication of Fontroy is that under the policy at issue therein, upheld as not being violative of the inmates' First Amendment rights, the opening of mail even from the inmate's attorney or a court (which, is the very definition of "legal mail" under Fontroy) that does not contain the requisite control number does not violate an inmate's First Amendment right to free speech.  This would have been the same result even under the Third Circuit's earlier case of Bieregu v. Reno, 59 F.3d 1445, 1452 (3d Cir. 1995)(although the Bieregu Court's right of access  holding was overturned,[5] the alternative First Amendment freedom of speech holding was not and so the

_____
[5]  Jones v. Brown, 461 F.3d 353, 359 n.6 (3d Cir. 2006).

<u>Bieregu</u> Court's holding that "we are satisfied that a pattern and practice of opening **properly marked** incoming court mail outside an inmate's presence infringes communication protected by the right to free speech. Such a practice chills protected expression and may inhibit the inmate's ability to speak, protest, and complain openly, directly, and without reservation with the court.")(emphasis added). Moreover, we find that who gets to define "properly marked" is the DOC, as was at least impliedly held in <u>Fontroy</u>.

The <u>Fontroy</u> Court addressed at least impliedly both issues that this case raises. The first issue, i.e., what is the definition of "legal mail," the court addressed in a footnote by merely observing that "for the purposes of this opinion, we use the term "legal mail" to refer to incoming attorney and court mail, collectively." <u>Fontroy</u>, 559 F.3d at 174, n.1. The Court did note that the DOC policy governing mail does not have a definition of "legal mail" as such, but rather speaks in terms of "privileged correspondence." The <u>Fontroy</u> Court went on to explain that "[t]he designation 'Privileged Correspondence' does not necessarily equate with legal privilege. The DOC's mail policies define Privileged Correspondence as correspondence that meets specified conditions, and it has been limited to communications from attorneys, courts, and certain elected and appointed officials." <u>Fontroy</u>, 559 F.3d at 175, n.2. We take the <u>Fontroy</u> court's statement that the "privileged correspondence does not necessarily equate with legal privilege" to mean that the privileged correspondence actually includes more than legal privilege, (which phrase, we take to mean essentially "legal mail") because "privileged correspondence" includes mail to and from elected and appointed officials.

The definition of "legal mail" is crucial to the outcome of this case because Plaintiff claims essentially that "legal" mail is any mail from any attorney irrespective of the relationship Plaintiff has with the attorney, <u>see</u>, <u>e.g.</u>, Dkt. [1-3] at 22 to 24,  such as opposing counsel, as is

11

the case with the December 16, 2008 incident; Plaintiff also contends that the definition of legal mail includes mail from any court, any bar association, Dkt. [1-3] at 25, any legal project such as the Human Rights Watch (which stamped its envelope sent to Plaintiff with the appellation "Legal Mail"), Dkt. [1-3] at 20, or the Prisoners' Rights Research Project, id., at 27, or the Pennsylvania Institutional Law Project, id., at 29; or any governmental office, Dkt. [1-3] at 12, 17, 18, 26 (Pennsylvania State Police), 32 (District Attorney's Office). If Plaintiff is right as to the broad definition of "legal" mail, then his rights have arguably been violated because mail from opposing counsel and mail from the Pennsylvania Bar Association were, for present purposes, opened outside of Plaintiff's presence.

However, the Fontroy court already has held, at least, implicitly, that any mail from an attorney or court not bearing a control number may be opened outside the presence of the inmate without violating the inmate's First Amendment rights. Thus, we find the implication of Fontroy to be that "legal" mail for purposes of being entitled to the prophylactic protection of being opened only in the presence of the inmate is mail that comes from either an attorney or a court as is evidenced on the envelope by the presence of a control number on the envelope. Further, we find implicit in the holding of Fontroy that DOC has the right to define how it will be alerted to the fact that the envelope may contain "legal mail" for purposes of deciding how the particular piece of mail is to be handled, i.e., for purposes of deciding whether that piece of mail is subject to being opened only in the presence of the inmate.[6]

---

[6] See also Bell v. Mullins, No. 1:04-cv-0154, 2007 WL 912224, at * 5 (S.D.Oh. March 23, 2007)

Finally, to the extent that Bell is attempting to challenge the OAC regulations governing "legal mail" and "minor contraband," such a challenge is foreclosed by the Supreme Court: "We held in *Turner v. Safley*, 482 U.S. 78, 96 L.Ed.2d 64, 107 S.Ct. 2254 (1987), that a prison regulation impinging on inmates' constitutional rights "is valid

Indeed, DOC has exercised that right in promulgating policies to govern the handling of mail. We take judicial notice of the fact that DOC has promulgated DC-ADM 803 entitled Inmate Mail and Incoming Publications.[7] We further note that the version now in effect as of the writing of this was promulgated April 18, 2008 and effective April 28, 2008, which would be the applicable policy for Plaintiff's complaints occurring in May and December of 2008. We are not sure of what differences, if any, occurred between the version of this policy that the <u>Fontroy</u> court had before it and the current policy at issue herein; the DOC website does not provide prior versions. But we think there must have been some significant change given that the current policy states that:

> 2. Incoming Privileged Correspondence: Mail from a court or an inmate's attorney will be opened for the first time in the presence of the inmate and inspected for contraband, but not read.
>> a. Mail from a court or an attorney will be opened for the first time

---

if it is reasonably related to legitimate penological interests." *Id*., at 89. Such a deferential standard is necessary, we explained,

> "if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.' Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration."

*Lewis v. Casey*, 518 U.S. at 361 (internal block citation omitted). The definition and treatment of "legal mail" and the "contraband" regulations are entitled to deference from this Court. Bell has not articulated any basis upon which the Court could conclude that deference is not due the prison officials' interpretation and application of the mail regulations. . . .

[7]  DC-ADM 803 is available at the DOC website:

http://www.cor.state.pa.us/standards/lib/standards/803_Inmate_Mail_and_Incoming_Publications_Policy
_Manual.pdf

(Site last visited May 15, 2009). Because the DOC often revises policies and does not indicate what the changes are in the newly revised policies, the Court will append to the end of this Report, for the sake of any reviewing court a copy of the current version of DC-ADM 803 which was also the version covering the May and December 2008 events, complained of by Plaintiff. See Appendix A.

in the presence of the inmate. The mail will be inspected for contraband, but will not be read.

b. If upon opening the envelope in the presence of the inmate, the staff member without reading the contents, notices that the contents contain absolutely no legal material (e.g., contains only a publication readily available to the public with no notations from counsel), the staff member shall issue the contents to the inmate and complete a **DC- 121, Part 3, Employee Report of Incident**, in accordance with Department policy **6.3.1, "Facility Security"** for submission to the Shift Commander and the Facility Manager/designee. The report shall include: the contents that were deemed not to be legal material; the name and Department number of the inmate who received the mail; and the name and address of the person who sent the mail. The Facility Manager/designee shall forward a copy of the staff member's report to the Office of Chief Counsel and the Bureau of Standards and Security for review and tracking.

c. The Office of Chief Counsel will issue a control number to a court or attorney as provided in **37 Pa. Code §93.2**; however mail from a court or an attorney will be handled as set forth in paragraphs (a) and (b) above even if a control number does not appear on the envelope.

Subsection c strikes us as perhaps making the biggest change from the policy at issue in <u>Fontroy</u> since one would have expected the <u>Fontroy</u> Court to have mentioned such a rule if it had been in existence at the time.

What does this policy change mean for Plaintiff's current First Amendment claim challenging the opening his so-called "legal" mail?  For one thing, as a general matter, it means that legal mail is again defined to be "Mail from a court or an inmate's attorney . . ." (as per DC-ADM 803, *supra* now provides) even if the envelope containing the mail does not have a control number.  Significantly, this is the precise definition of "legal mail" used by the Court in <u>Bieregu</u>.  <u>Bieregu v. Reno</u>, 59 F.3d at 1449 ("For convenience, we will refer to correspondence between an inmate and attorney as "attorney mail" and to correspondence between an inmate and a state or federal judge, clerk's office, or other courthouse address as "court mail."  We use the phrase "legal mail" as a general term including both attorney and court mail.").  Hence, whether the

Court or the DOC has the right to define "legal mail" in the first instance becomes somewhat of a non-issue because the definition coming from the Third Circuit and the definition coming from the DOC would appear to be the same.

What of the meaning of the change in policy, more specifically for Plaintiff's case? What does that change mean for Plaintiff's case? We think the change means nothing because the implicit holding of <u>Fontroy</u> that DOC has the right, in the first instance, to determine how it will be alerted to the fact that the contents of incoming envelopes contain "legal" mail or perhaps, more accurately, "privileged correspondence" for purposes of how it will handle such incoming mail, survives any such change in DOC's policy. While DOC's policy no longer requires a control number for incoming mail to be considered "legal" mail or mail required to be opened only in the presence of the inmate, and hence, appears even more protective of inmates' First Amendment rights than did the policy at issue in <u>Fontroy</u>, DOC's current policy does define "legal" mail, so to speak, when it defines "incoming privileged correspondence." Regrettably, there is not a uniformity of language used by the DOC in its DC-ADM 803. For example, under Section 2 quoted above, it appears that "Incoming Privileged Correspondence" is essentially defined as "Mail from a court or an **inmate's** attorney[.]" (emphasis added). This would indicate that there must be an attorney-client relationship between the inmate and the attorney.[8] However, in subsection 2.a., there is a slight change, specifically, it implies that incoming privileged correspondence is "[m]ail from a court or **an** attorney . . ." (emphasis added), this time leaving out the requirement that the mail from an attorney be mail from the **inmate's** attorney. Unfortunately, in what apparently is the definitional section of DC-ADM 803, there is no

---

[8] The difficulty with such a requirement is how does one looking at the envelope with an return address of an attorney know whether the attorney has an attorney client relationship with the inmate or not. This issue is not addressed in the policy.

definition, as such, of "incoming privileged correspondence" but there is a definition for "Incoming Sealed Privileged Correspondence" which is defined as "Mail from the Court or an inmate's attorney." We deem this minor linguistic variation to be merely an oversight and find that for purposes of DC-ADM 803, in order to qualify for special handling of incoming mail, requiring that it be opened in the presence of the inmate, the mail must be identifiable as being from a Court or from the inmate's attorney. We are bolstered in this understanding by the definition of "attorney" which is provided in a subsection defining "Outgoing Privileged Correspondence" which defines attorney as "Any person authorized under applicable law to practice law and who is engaged in an attorney/client relationship with the inmate addressee." Given this definition of "legal mail" or rather "privileged correspondence," which includes "legal" mail, the complaint clearly fails to state a claim because the two envelopes opened do not contain "legal mail" within the contemplation of the DOC definition and/or any precedential or even non-precedential Third Circuit Appeals Court's definition of which this Court is aware.

Thus, the question presented is was Plaintiff's First Amendment right to free speech violated by the Defendants opening of his mail addressed from the Pennsylvania Bar Association in May 2008. We conclude it was not because the correspondence was not from an attorney, as such, let alone from an attorney who has an attorney-client relationship with Plaintiff nor was it correspondence from a court and hence, it was not entitled to any particular constitutional protections nor to the special handling that DOC reserves for incoming privileged correspondence. Sallier v. Brooks, 343 F.3d 868, 875 (6th Cir. 2003)("Sallier alleged that on May 10, 1995, he received correspondence from the American Bar Association that was opened by the defendants outside his presence. Nothing on the envelope indicated that it contained confidential, personal, or privileged material, that it was sent from a specific attorney at the ABA, or that it

16

related to a currently pending legal matter in which Sallier was involved. The ABA is a professional organization designed to support attorneys in a variety of ways; it is not an organization that has the authority to take action on behalf of an inmate. Given that the ABA is not a direct-services legal organization and generally does not provide legal advice and that the envelope contained no marking to alert a prison employee that it was to be opened only in the presence of the prisoner, receipt of this correspondence did not implicate constitutionally protected legal mail rights.")(citations omitted).

Next, we confront the question of whether the DOC defendants' opening of his mail in December 2008 from Attorney Kenyon, Plaintiff's opposing counsel in Caldwell v. Fogel, No. 08-728 (W.D. Pa.), violated his First Amendment speech rights. We conclude that it did not because Attorney Kenyon did not possess an attorney-client relationship with Plaintiff. Accordingly, Plaintiff's First Amendment rights were not violated because we find that his "legal" mail was not opened outside of his presence because the mail he indicates was opened outside his presence was not "legal" mail as that term is essentially defined by DOC and/or as defined by the Third Circuit, repeatedly in various cases.[9] See Bieregu, 59 F.3d at 1456 ("interference with attorney mail probably infringes the right of court access even more than interference with court mail, whether the correspondence relates to a criminal conviction, a subsequent collateral proceeding, or a civil suit to protect an inmate's constitutional rights. Of all communications, attorney mail is the most sacrosanct. Thus, although the Sixth Amendment is not recognized as the repository for such a shield in civil matters, *see Finley*, supra, the right of

---

[9] In any event, even if the definition of "legal" mail, for purposes of First Amendment freedom of speech analysis, is broader than mail from an attorney with whom the prisoner has an attorney client relationship and/or mail from a court, this case requires us only to decide whether the definition of legal mail includes mail from the Pennsylvania Bar Association and mail from opposing counsel. We hold that however broad the definition of "legal mail" is, it does not include these two pieces of mail.

court access guarantees the privacy of **attorney-client communications**.")(emphasis added);

Samonte v. Maglinti, Civ. No. 05-00598, 2007 WL 1963697, at *6 (D.Haw. July 3,

2007)("Moreover, mail from the Prosecuting Attorney, by definition Samonte's opposing

counsel, rather than mail from his own attorney is not 'legal mail.' *See Keenan*, 83 F.3d at 1094.

There is no confidential relationship between a litigant and the opposing attorney, unlike the

confidential attorney-client relationship that exists between a litigant and his own attorney.

Processing mail from opposing counsel, or, as alleged here, from the Prosecutor, as regular mail

instead of as legal mail did not violate Samonte's constitutional rights. Claims relating to these

pieces of mail are dismissed with prejudice.").  Thus, even if we assumed for the sake of

argument that the envelope, containing the missive from Attorney Kenyon, may have indicated it

was from an attorney and hence, potentially "legal" mail, such would not be sufficient to bring

the correspondence contained therein within the special protections Courts have deemed required

for communications from courts and from attorneys who possess an attorney client relationship

with inmates.  Accordingly, Plaintiff's claim that the missive from Attorney Kenyon constituted

"legal" mail fails to state a claim upon which relief can be granted.

Accordingly because on neither the May or December 2008 occasion was "legal mail"

opened outside of Plaintiff's presence, his First Amendment rights were not violated.

In the alternative, even if we were to assume that the contents of the envelopes that

Plaintiff received in May and December 2008 fell within the definition of "legal mail" and

thereby should have been opened only in Plaintiff's presence, his complaint would still fail to

state a claim upon which relief could be granted.  His complaint utterly fails to allege that the

envelopes containing the assumed-to-be "legal mail" complied with the DOC policies governing

incoming mail and the DOC requirements for being treated as such.

The basic problem here is how do we protect inmates' conceded First Amendment right to receive confidential communications from their attorneys and/or from the Courts by assuring that DOC officials do not **read** those communications. See, e.g., Hunt v. Miller, No. 2:07-CV-287, 2007 WL 2903195, at *5 (N.D.Ind. Sept. 28, 2007)("The purpose of preventing jails and prisons from opening legal mail outside of the presence of an inmate is to protect the Sixth Amendment right to counsel and the attorney-client privilege by ensuring that prison officials merely inspect for contraband and do not read confidential communications between an inmate and his counsel."), *amended on other grounds on reconsideration in part by*, 2008 WL 2002258 (N.D.Ind. May 6, 2008) . In order to assure that inmate legal mail is not read by prison officials, Courts have fashioned the prophylactic rule that prison officials must only open such mailed communications in the presence of the inmate. See, e.g., Moore v. Hoeven, No. 1:08-cv-028, 2008 WL 1902451 (D.N.D. April 28, 2008).[10]    However, the next question arises is how are the

_____

[10]  The Court in Moore v. Hoeven explained as follows:

> But even if this conclusion is wrong and that mail from other "legal" sources is entitled to constitutional protection, the clear import of the Eighth Circuit cases, as well as the language of *Wolff v. McDonnell*, is that there would only be a violation when the failure to follow *Wolff's* **prophylactic** procedures resulted in prison authorities reviewing matters that were of a confidential or privileged nature. And that, for example, there would be no violation if prison authorities opened court mail that contained nothing more than copies of documents that are of public record.  *Martin v. Brewer*, 830 F.2d 76, 78 (7th Cir. 1987); *cf. Moore v. Rowley*, 126 Fed.Appx. at 760-761 (*citing Martin v. Brewer* for the proposition that court filings which are a matter of public record are not entitled to special protection). The constitutional interest, to the extent that there is one, is in prison officials not being able to read privileged or confidential information-not simply the failure to follow the procedures employed to help insure this does not take place. *See Kaufman v. McCaughtry*, 419 F.3d 678, 656-658 (7th Cir. 2005) (stating that prison officials who open mail marked with an attorney's name and a warning that the mail is confidential may "potentially" violate the prisoner's rights if opened outside his presence but the court still must find that the contents of the mail were in fact privileged to qualify as "legal" mail). . . .

Id., at *12 n.13 (emphasis added).

19

prison officials to know that any particular piece of mail is within the protection or how are they to be alerted to such. Actually, the antecedent question is who is to determine what procedures are to be put into place for so notifying the prison officials. We believe, like the Court in <u>Fontroy</u>, that in the first instance, it is the DOC who should so determine how the DOC officials are to be made aware.

At one point, the answer to the question of how are such DOC officials to be alerted was by merely reading the return address to determine if the mail is from the courts or an attorney, at least that seemed to be the answer provided by some Courts and by DOC's earlier pre-<u>Fontroy</u> mail policy. However, as explained by the Court in <u>Fontroy</u>, this proved to be unsatisfactory. Hence, the control number was devised so as to assure that mail from the courts and from the inmate's attorney would be treated in such a manner as to assure that it was not read by the prison personnel by requiring that such mail be opened in the inmate's presence. Now, and at the time of the two incidents in 2008, it appears that the control number requirement has been abandoned as a **requirement**, but not as a helpful means of alerting DOC officials, and the DOC has returned to looking for whether the return address is from an inmate's attorney or from a Court. Again, the difficulty with this is the correspondence may be from an attorney but not from the "inmate's attorney" i.e., the attorney who has an attorney client relationship with the inmate. In any event, we think it best to permit the DOC personnel, at least in the first instance, determine how they shall be alerted to the prophylactic requirement to only open in the inmate's presence that presumptively confidential legal mail, i.e., mail that is from a court and/or from the inmate's attorney. <u>See</u>, <u>e.g.</u>, <u>Wolff v. McDonnell</u>, 418 U.S. 539, 576 (1974)(finding it entirely appropriate for a state to require any communication from an attorney to be specially marked as

---

originating from an attorney, including the attorney's name and address, if the communication is to be given special treatment); Jenkins v. Huntley, 235 Fed.Appx. 374, 376-77 (7th Cir. 2007) ("There may be some disagreement among the circuits concerning the scope of the definition of legal mail, but there is no dispute concerning the constitutionality of regulations requiring that prison mail from attorneys be labeled in order to receive special treatment. Jenkins's reliance on the Sixth Circuit's decision in *Muhammad* is misplaced because, unlike the Michigan DOC regulations at issue in that case, the IDOC regulations provide heightened protection to properly labeled privileged mail. Jenkins could not avail himself of that protection, either because he neglected to ask the State's Attorney's Office to label its correspondence as privileged, or because the sender did not think the correspondence was privileged. By annexing copies of the unlabeled envelopes to his amended complaint, Jenkins has pleaded himself out of court.")(citations omitted); Boswell v. Mayer, 169 F.3d 384, 388-89 (6th Cir. 1999) (upholding prison policy of treating mail from a state attorney general's office as protected legal mail only if (a) the envelope contains the return address of a licensed attorney and (b) the envelope has markings that warn of its privileged content); Schenck v. Edwards, 133 F.3d 929 (Table), 1998 WL 4082, at *2 (9th Cir. 1998) ("Schenck alleges that officials opened and read his legal mail outside of his presence, and that mail he tried to post was refused. "Legal Mail" is quite specifically defined in the prison regulations. To qualify as legal mail, '[t]he front of the envelope must be clearly marked LEGAL MAIL.' Division Directive, DOP § 590.500. Schenck admits that his opened mail was not marked 'LEGAL MAIL' but instead 'Legal Documents Enclosed.' While the difference may seem slight, the latter does not conform to prison regulations and, although it denotes that legal documents are contained within the envelope, it does not ensure that its contents are exclusively 'legal mail.' Such improper labelling vitiated the mail's exemption from

search.").

Thus, the First Amendment free speech claim of interference with incoming legal mail in May and December 2008 is properly dismissed because Plaintiff did not allege that the envelopes came within the DOC policy for requiring special treatment.  Hence, under Twombly, Plaintiff has not alleged sufficient facts to nudge his case beyond the required line.  Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008)("The Court [in Twombly] explained that a plaintiff must 'nudge [his or her] claims across the line from conceivable to plausible' in order to survive a motion to dismiss.")  Moreover, although Plaintiff did not attach the envelopes from either May or December 2008 to his complaint, he does attach the grievance response concerning the May 2008 incident and such affirmatively establishes that the May 2008 envelope did not come within DOC's policy requirements to be entitled to be opened only in Plaintiff's presence.

The grievance response indicated that "[t]he DC ADM 803 clearly states in order for mail to be considered privileged it must be someone who is authorized to practice law and who is engaged in an attorney/client relationship with the inmate addressee.  Further, all correspondence must be marked with an attorney's full name or the full name and address of the law firm.  The correspondence in question is from the Pennsylvania Bar Association, Lawyer Referral Service; which does not fall under the above criteria."  Dkt. [1-2] at 4.

As to the December envelope, again despite the many exhibits he attaches to his complaint, he did not attach the envelope from Attorney Kenyon.  However, it appears from what Plaintiff himself wrote in his grievance, the return address in the upper left hand of the envelope indicated only the following: "Pietragallo Gordon Alfano, Bosick & Raspanti, LLP." in addition to an address.  Dkt. [1-2] at 7 & 10.  The second level grievance response, indicates that apparently, this return address was not sufficient to alert the mail handlers that the envelope was

from a lawyer or law firm.  <u>See</u> Dkt. [1-2] at 11 ("According to DC-ADM 803 Section 1 pages 1-4, 2 a. and b, if a determination can be made that the mail is legal it is treated as such.").   We find that the listing of the firm name of Attorney Kenyon's firm without more, such as an indication those names are the names of a law firm as opposed to any other kind of professional firm, simply does not comport with DOC policy for requiring special handling, as was apparently determined by the DOC officials themselves in their responses to Plaintiff's grievance. Accordingly, the Defendants did not violate Plaintiff's rights.  <u>See</u>, <u>e.g.</u>, <u>Kaufman v. McCaughtry</u>, No. 03-C-027-C, 2004 WL 257133, at *2 & *6  (W.D.Wis. Feb. 9, 2004)(where a letter with a return address was marked "Langrock, Sperry, & Wool, LLP" and "The envelope did not identify the correspondence as confidential, coming from a lawyer" and where "Langrock, Sperry, & Wool, LLP did not represent plaintiff in any legal action[,]" the court went onto hold that "it is undisputed that the envelopes at issue did not indicate that the correspondence was confidential or from a lawyer. Prisons do not violate the constitutional rights of inmates by adopting administrative procedures that provide that only mail bearing specific markings must be opened in front of the inmate. *Wolff*, 418 U.S. at 576-77 . . . .  Even correspondence from lawyers can be opened outside an inmate's presence if it is not marked as required by the policy. *Martin*, 830 F.2d at 78."), *affirmed in relevant part, and vacated in part, and remanded by*, 419 F.3d 678, 686 (7th Cir. 2005).

Accordingly, to summarize, Plaintiff's First Amendment claim fails for at least two independent reasons.  First, the contents of the envelopes which were actually opened outside of Plaintiff's presence does not constitute "legal mail' within the constitutional definition.  Second, even if the contents of the envelopes did contain legal mail, because the envelopes did not comport with DOC policies for entitlement to special handling, Plaintiff's rights were not

violated.

Alternatively, even if the contents did constitute "legal mail" and the envelopes were minimally sufficient to come within the DOC policy, we conclude that Defendants are entitled to qualified immunity for their alleged roles in the opening of Plaintiff's mail in May and December.

> The Court of Appeals has
>
> explained that a qualified immunity analysis must begin with this threshold question: do the facts alleged, viewed in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right? *Saucier*, 121 S.Ct. at 2156. If the plaintiff fails to allege the violation of a constitutional right, no further inquiry is necessary. If, however, the alleged facts show that there was a constitutional violation, then the next step is to ask whether the right was clearly established. *See id*. In other words, a court must consider "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. (*citing Wilson v. Layne*, 526 U.S. 603, 615 (1999)). This inquiry, the Court noted, "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*. If a court concludes that an officer's conduct did violate a clearly established constitutional right, then it must deny him the protection afforded by qualified immunity.

Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002). For the limited purpose of deciding the qualified immunity question, the court will assume without deciding that Plaintiff's First Amendment opening of incoming mail claim states a violation of his constitutional rights.[11]

Although in the preceding analysis, the Court determined that the Defendants did not violate Plaintiff's constitutional rights even if, for the sake of argument, the court assumed such actions on the part of the Defendants did violate Plaintiff's constitutional rights, they would still be entitled to dismissal of the First Amendment claims on the basis of qualified immunity.

---

[11] Recently, the Supreme Court receded from the qualified immunity rule in Saucier v. Katz, that required the courts to first determine whether a constitutional violation occurred and only then proceed to determine if it would have been clear to a reasonable person that their actions violated clearly established law. Pearson v. Callahan, __ U.S. __, 129 S.Ct. 808 (Jan. 21, 2009).

Given the foregoing analysis above, concerning various Courts' treatment of letters from Bar Associations, and letters from opposing counsel as not being within the definition of legal mail, and the lack of clarity on the envelopes concerning whether they met the criteria for meriting special treatment under DC-ADM 803, we conclude that it would not have been clear to reasonable officials in the shoes of the Defendants that opening such envelopes violated clearly established law of which a reasonable person would have known. In other words, it would not have been clear to a reasonable officer that his conduct in opening the envelopes was unlawful. See, e.g., Egolf v. Witmer, 526 F.3d 104, 110 (3d Cir. 2008) ("The second prong of the qualified immunity analysis is focused upon 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'")(quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)). See also Patterson v. Baldwin, 39 F.3d 1188 (Table), 1994 WL 594721, at *3 (9th Cir. 1994)("Here, Patterson contends that even though his mail was not marked legal mail, the fact that the envelopes bore the official return address of the court and were marked 'official business' allowed prison officials to distinguish it from non-legal mail. Thus, Patterson contends that because these letters were clearly marked as mail from a Court, prison officials could open them for inspection only in his presence.. . . . the relevant Oregon regulation applicable at the time defined 'legal mail' as mail to or from an attorney, court or court official which is clearly worded 'legal mail' on the addressee side of the envelope. OAR 291-131-010(13). Given these circumstances, Patterson has failed to show that the officials' conduct violated a clearly established statutory or constitutional right of which a reasonable official would have known. *See Camarillo*, 998 F.2d at 639. Accordingly, the defendants were entitled to qualified immunity on this claim.").

Moreover, even if Plaintiff could have established that DOC's own policies regarding

legal mail were violated by the Defendants' alleged actions, something which the exhibits attached to Plaintiff's complaint affirmatively rebut, all of the Defendants would still be entitled to qualified immunity. See, e.g., Davis v. Scherer, 468 U.S. 183, 194 (1984)("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."); Brown v. Grabowski, 922 F.2d 1097, 1113 (3d Cir. 1990) (holding a state official's violation of a New Jersey statute "irrelevant" to the determination whether defendants violated a "clearly established" constitutional right of plaintiff's).

While Plaintiff sought both injunctive relief and damages, Dkt. [1] at 5, ¶ VI, & at 6 to 8, because he has, since the initiation of this suit, been transferred out of SCI-Greene and is no longer subject to any of the Defendants employed there, any such claims for injunctive relief are moot.[12] Hence, the qualified immunity defense would render dismissal proper as to the First Amendment claims and would completely dispose of those claims as against the Defendants given that only a claim for money damages would remain.

Accordingly, for any and/or all of the above reasons, these claims should be dismissed for failure to state a claim upon which relief can be granted.

*Right of Access to the Courts Claim*

We turn next to Plaintiff's complaint that the Defendants denied him his right of access to

---

[12] The "rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Steffel v. Thompson, 415 U.S. 452, 459 n.10 (1974). Where a plaintiff seeks injunctive relief for prison conditions that he can no longer be subject to, there is no longer a live controversy and a court cannot grant that injunctive relief. See Abdul-Akbar v. Watson, 4 F.3d 195, 206 (3d Cir. 1993); Fortes v. Harding, 19 F.Supp.2d 323, 326 (M.D.Pa. 1998)("Fortes' [i.e., the inmate] transfer to another institution moots any claims for injunctive or declaratory relief."); Marrie v. Nickels, 70 F.Supp.2d 1252, 1259 (D.Kan. 1999) ("Generally, an inmate's transfer to another prison or release moots his request for declaratory or injunctive relief.") (collecting cases).

the Courts when they somehow interfered with this ability to file the statement of matters complained of on appeal in one of his cases in state court.

We can dispose of this claim readily. There are two flaws with the claim. First, this claim is time barred. The statute of limitations for 42 U.S.C. § 1983 actions, such as this case, is two years. <u>See</u> <u>Smith v. Holtz</u>, 87 F.3d 108, 111 n.2 (3d Cir. 1996)(statute of limitations for § 1983 is the state statute of limitations for personal injury/tort actions, which, in Pennsylvania, is 42 Pa.C.S.A. § 5524 that establishes a 2 year statute of limitation for tort actions). The statute of limitations requires that a complaint be filed within its time limits from the time a cause of action accrues. <u>See</u> <u>Sprint Communications Co., L.P. v. F.C.C.</u>, 76 F.3d 1221, 1226 (D.C. Cir. 1996).

The alleged interference by the Defendants with Plaintiff's statement of matters complained of on appeal must have, by logic, occurred after he was ordered to file the statement, which would have been November 20, 2006, Dkt. [1-3] at 2 (the date of the order from the court requiring him to file the statement), or more accurately, after December 6, 2006, the date whereon he signed the statement, Dkt. [1-3] at 4 to 5, but before January 17, 2007, when the State Trial Court issued its opinion, indicating that Plaintiff's issues had been waived on appeal for failure to file such a statement. Hence, at the latest, the Defendants' alleged actions in interfering with the statement's mailing occurred prior to January 17, 2007. The soonest Plaintiff could be deemed to have filed the present complaint raising this claim was February 18, 2009, the date whereon he executed both his IFP application and his complaint. Because February 18, 2009 is more than two years after January 17, 2007, and the applicable statute of limitations to this cause of action is two years, the complaint is time barred as to this claim and should be dismissed as such.

The foregoing reasoning concerning the untimeliness of the claims applies with even

greater force to Plaintiff's additional denial of access claim, namely his claim that the DOC Defendants delayed his receipt of the State PCRA trial Court's order to him to file the statement of matters complained of on appeal. This is because, by necessity, any such actions occurred prior to December 6, 2007, the date he allegedly sent out the statement of matters complained of on appeal, which was obviously **after** he had received the Court order to do so. Hence, this particular claim is time barred as well. Alternatively, this particular claim is barred by res judicata and/or collateral estoppel. See Caldwell v. Beard, 305 Fed.Appx. 1 (3d Cir. 2008).[13]

In the alternative, Plaintiff has failed to state a claim of a denial of his First Amendment right of access to the Courts based upon the alleged interference with his outgoing statement of matters complained of on appeal because the alleged actions of the defendants in interfering with that statement, did not interfere with a non frivolous suit.

The Supreme Court declared that in order to state a claim for denial of access, the allegedly lost suit must have been non-frivolous, otherwise, losing the ability to litigate a

---

[13] The Court of Appeals addressed this claim as follows:

Caldwell's access to the courts claim is based on alleged interference with his ability to respond to an order of the Philadelphia County Court of Common Pleas, filed on November 20, 2006. That order directed Caldwell to file within 14 days a Statement of Matters complained of on Appeal in connection with his second Post Conviction Relief Act petition. See Pennsylvania Rule of Appellate Procedure 1925(b). Caldwell claimed that the Department of Corrections' policy of not delivering mail on Saturdays delayed his receipt of the order until November 28, 2006.
    He also asserted that he was prevented from using the law library on December 1, 2006, and was "[s]topped ... from mailing out the Documents of Matters Complained of on Appeal" on December 3, 2006. Importantly, however, nowhere in his original complaint, his amended complaint, or his objections to the Report and Recommendation did Caldwell allege that he was prevented from mailing his Rule 1925(b) statement on Monday, December 4, 2006, which presumably would have constituted a timely response. Accordingly, Caldwell failed to state a claim for denial of access to the courts.

Caldwell, 305 Fed.Appx. at 3 to 4 (citations omitted)

frivolous suit simply causes no injury.  Christopher v. Harbury, 536 U.S. 403 (2002).  As explained by the Supreme Court, the "very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong. . . .  the right [of access claim] is ancillary to the underlying claim, without which the plaintiff cannot have suffered injury by being shut out of court."  Christopher, 536 U.S. at 414-15.  Therefore, "[i]t follows that the underlying cause of action . . . is an element that must be described in the complaint, just as much as the allegations must describe the official acts frustrating the claim."  Id. at 415.  In addition, the court explained the pleading requirement to demonstrate actual injury as follows:

> Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant. Although we have no reason here to try to describe pleading standards for the entire spectrum of access claims, this is the place to address a particular risk inherent in backward-looking claims [i.e., claims, such as the one Plaintiff brings herein, that past behavior of officials have caused a party to lose access to courts in the past]. Characteristically, the action underlying this sort of access claim will not be tried independently, a fact that enhances the natural temptation on the part of plaintiffs to claim too much, by alleging more than might be shown in a full trial focused solely on the details of the predicate action.

> Hence the need for care in requiring that the predicate claim be described well enough to apply the "nonfrivolous" test and to show that the "arguable" nature of the underlying claim is more than hope.  And because these backward-looking cases are brought to get relief unobtainable in other suits, the remedy sought must itself be identified to hedge against the risk that an access claim be tried all the way through, only to find that the court can award no remedy that the plaintiff could not have been awarded on a presently existing claim.

Id., at 416 (footnotes and citations omitted).

Plaintiff's complaint suffers two flaws under Christopher.  First, Plaintiff has failed to sufficiently identify with specificity the suit which he sought to bring or was litigating was non-frivolous.  He has failed to offer sufficient factual allegations concerning that suit for this Court

to conduct its non-frivolousness review pursuant to <u>Christopher</u>.

Secondly, to the extent that he has identified the allegedly lost suit at all, via exhibits attached to his complaint, it would appear that the "lost" suit was his second PCRA petition. Dkt. [1-3] at 2 to 9.  The Court takes judicial notice of the fact that the suit was one of Plaintiff's PCRA petitions filed in the case of <u>Commonwealth v. Clay Caldwell</u>, No. CP-51-CR-1107861-1999 (C.P. Phil.).[14]   The Court takes further judicial notice of the Superior Court opinion in <u>Commonwealth v. Caldwell</u>, No. 1705 EDA 2006 (Pa. Super.),[15] which affirmed the denial of the PCRA petition as having been untimely filed.  Hence, it affirmatively appears that, even if Plaintiff's right of access to the courts was violated in regards to the PCRA petition, he suffered no injury, i.e., the PCRA petition was frivolous.  <u>See</u>, <u>e.g.</u>, <u>Lee v. Jones</u>, No. CIV. A. 00-0153-BH-C, 2001 WL 102364, at *3 (S.D. Ala. Jan. 18, 2001)(in rejecting the denial of access to courts claim, the Court ruled: "it appears that Plaintiff's Rule 32 petition[16] is more than likely time-barred and is, therefore, a frivolous action. Accordingly, the undersigned finds that Plaintiff

---

[14]  The dockets of this case are available at

http://ujsportal.pacourts.us/DocketSheets/CPReport.aspx?matterID=103833706

[15]  <u>See</u> Dkt. [1-3] at 4, listing in the caption of the statement of matters complained of on appeal, the Superior Court Docket Number of 1705 EDA 2006.  The Court attaches hereto as an appendix the Superior Court opinion in No. 1705 EDA 2006.  In addition, the Court also attaches as an appendix the Superior Court opinion in <u>Commonwealth v. Caldwell</u>, No. 192 EDA 2007, which is a companion case. See Appendix B.  As explained in the Superior Court opinions, Plaintiff apparently pleaded guilty to two different crimes at two different docket numbers in the Court of Common Pleas, both involving the girlfriend whom he killed.  There is some confusion as to which appeal concerns which crime or criminal docket number.  However in both cases, on appeal, the Superior Court determined that the PCRA petitions were time barred.   Thus, we need not decide which appeal the statement of matters complained related to in order to know that the statement of matters related to one of the two appeals and that both appeals were resolved against Plaintiff on the basis that his PCRA petitions were time barred.

[16]  The Rule 32 petition reference is a reference to Alabama's post conviction relief procedure. See Rule 32 Alabama Rules of Criminal Procedure; <u>State v. Wilson</u>, 2005 WL 3118939 (Ala.Crim.App. Nov. 23, 2005), *rev'd*, 961 So.2d 911 (Ala. 2006) .

has failed to state a claim upon which relief may be granted due to his failure to establish that he suffered an actual injury in his collateral attack of his conviction and that the collateral attack was nonfrivolous."). Because such untimely PCRA petitions, over which the State Courts lack jurisdiction, simply are not "non-frivolous" within the contemplation of <u>Christopher</u>, Plaintiff's denial of access to courts claim fails as a matter of law.

*Fourteenth Amendment Claims*

As for Plaintiff's Fourteenth Amendment claims, we find that they fail to state a claim as well. To the extent that Plaintiff is claiming a denial of a liberty interest by the opening of his mail we find such is not an atypical and significant hardship so as to qualify for any procedural protections. <u>Donovan v. Magnusson</u>,, No. Civ. 04-102, 2005 WL 757585, at *2 (D.Me. March 11, 2005) ("Any claims that the opening of his mail out of his presence offended the Fourth or Fourteenth Amendment due process clause must fail, *see Sandin v. Conner*, 515 U.S. *472, 483-84 (1995); Hudson v. Palmer, 468 U.S. 517 (1984); Barstow v. Kennebec County Jail*, 115 F.Supp.2d 3, 8 (D.Me. 2000)"). To the extent that Plaintiff is claiming an interference with a property interest by the opening of his mail, *a la* Professor Hohfeld, i.e., an interference with one of the bundle of recognized rights,[17] the Court finds that merely opening any mail outside of the

---

[17] <u>See</u>, <u>e.g.</u>, <u>Burns v. Dept. of Corrections</u>, 544 F.3d 279 (3d Cir. 2008)(finding a prisoner has a property interest in the "security" of his inmate account based on legal theories advance by Professor Hohfeld). <u>See also</u> <u>id.</u>, at 287 (listing the eleven standard incidents of property). To the extent that <u>Burns</u> could even remotely be read to suggest the existence of a property interest in envelopes not being opened outside the presence of the inmate, we find <u>Burns</u> limited to its facts. <u>See id.</u>, at 290, n.8 ("First, we do not hold that any impairment of one of Honoré's 'incidents' of property is sufficient to trigger due process protections. We hold only that the Department of Corrections' assessment of Burns' institutional account, which this Court has previously recognized as a cognizable property interest, deprived him of a protected property interest where that assessment (1) placed the DOC in a position analogous to that of a Judgment Creditor; (2) clouded Burns's account for a period of more than three years; and (3) reduced the economic value and utility of that account. Whether the impairment of other so-called 'incidents' of property is sufficient to trigger the protections of due process is not before us.").

presence of the inmate does not interfere with one of those enumerated recognized property rights. In other words, having a property interest in not having one's incoming envelopes containing mail opened is one of those rights incompatible with the status of being a prisoner and, therefore, doing so does not deprive the prisoner of a property interest, as any such property interest is extinguished by the conviction and consequent fact of imprisonment. Cf. Hudson v. Palmer, 468 U.S. 517 (1984) (Fourth Amendment right to privacy in prisoner's property located within the cell does not survive incarceration); Wolff v. McDonnell, 418 U.S. 539, 577 (1974) ("The possibility that contraband will be enclosed in letters, even those from apparent attorneys, surely warrants prison officials' opening the letters. We disagree with the Court of Appeals that this should only be done in 'appropriate circumstances.' Since a flexible test, besides being unworkable, serves no arguable purpose in protecting any of the possible constitutional rights enumerated by respondent, we think that petitioners, by acceding to a rule whereby the inmate is present when mail **from attorneys** is inspected, have done all, **and perhaps even more**, than the Constitution requires.")(emphasis added).

To the extent that Plaintiff complains his procedural due process rights were violated by the interference with his outgoing mail of the statement of matters complained of on appeal, these claims are time barred as explained above.

As for the equal protection claim, Plaintiff utterly fails to allege anything that would remotely state an equal protection violation. In order to state an equal protection claim, plaintiff must show that: (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person. See Zahra v. Town

of Southold, 48 F.3d 674, 683 (2d Cir. 1995). Plaintiff utterly fails to allege that he was similarly situated to any other inmate and that he was treated differently from that other inmate. In fact, from what Plaintiff provides, it appears that envelopes with the names and addresses of the various agencies he indicated were opened, such as from a Bar Association, would, under the DC-ADM 803 policy be opened without regard to which inmate the envelopes were sent.

Lastly, because all of the defendants are state actors, the complaint fails to state a claim under the Fifth Amendment, which only applies as against Federal Government actors. Duncan v. Louisiana, 391 U.S. 145 (1968); Malloy v. Hogan, 378 U.S. 1 (1964); Cardenas v. Wigen, 921 F.Supp. 286, 290 n.7 (E.D. Pa. 1996).

Given that all of his claims fail to state a claim, the complaint must be dismissed prior to service pursuant to the PLRA screening provisions.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are permitted to file written objections and responses thereto in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections may constitute waiver of any appellate rights.

Respectfully submitted,

/s/ Amy Reynolds Hay
United States Magistrate Judge


Dated: 10 June, 2009

cc:     The Honorable Terence F. McVerry
        United States District Judge

        Clay Caldwell
        EM-2163
        SCI Greensburg
        165 SCI Lane
        Greensburg, PA 15601-9103